# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

№ 18-CV-4040 (MKB) (RER)

_____

NECTARIOS ARISTIDOU, *ET AL.*,

Plaintiffs,

VERSUS

AVIATION PORT SERVICES, LLC, *ET AL.*,

Defendants.

_____

**REPORT & RECOMMENDATION**

**February 21, 2020**

_____

**TO THE HONORABLE RACHEL P. KOVNER
UNITED STATES DISTRICT JUDGE**

**RAMON E. REYES, JR., U.S.M.J.**:

Before the Court are Plaintiffs' motions (1) to strike the answer and enter default, or to strike certain defenses and compel discovery (Dkt. No. 55), and (2) for "dismissal and sanctions" against Defendants and their counsel (Dkt. No. 56), both owing to Defendants' failure to provide discovery and their violation of multiple Court orders.[1] For the reasons which follow, I respectfully recommend that Plaintiffs' motion to strike the answer and enter default be granted.

---

[1] The Honorable Margo K. Brodie referred these motions to me. (*See* Order Referring Motion dated 10/2/19). Subsequently, this case was transferred to Your Honor. (*See* Case Reassignment dated 2/6/20).

## BACKGROUND[2]

This case was brought by eight former employees (collectively, "Plaintiffs") who worked for Defendant Aviation Port Services, Inc. ("APS") at John F. Kennedy International Airport ("JFK") between 2016 and 2018. (Dkt. No. 31 (Amended Complaint ("Am. Cmpl.")) at ¶¶ 17-24). "APS provides passenger and ramp services at more than a dozen airports throughout the United States, including" JFK. (*Id.* at ¶ 6). Defendants Tony Hogdahl ("Hogdahl") and Sean Slattery ("Slattery") are APS's chief executive officer and executive vice president, respectively. Hogdahl is a resident of California and Slattery is a resident of Washington.

Plaintiffs contend that Defendants violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") by making late payment of, and taking improper deductions from, their wages. (Am. Cmpl. at ¶¶ 94-100, 128-32). Plaintiffs also contend that Defendants violated the New York Labor Law ("NYLL") §§ 190 and 650 *et seq.* ("NYLL") not only because of the same conduct with respect to the FLSA violations, but by: (1) failing to provide wage notices; (2) making other improper wage deductions; (3) not paying required incentive pay; (4) failing to provide meal breaks; (5) failing to provide required uniform pay; and, (6) failing to provide wage supplements for required expenses. (Am. Cmpl. at ¶¶ 118-27, 138-5).[3] Defendants deny these allegations and contend further, among other affirmative defenses, that Hogdahl and Slattery are not subject to personal jurisdiction in New York. (Dkt. No. 37 ("Answer") at "Seventh Affirmative Defense," ¶¶ 7-8). Defendants also assert a counterclaim against Plaintiffs for attorney's fees pursuant to Section 195 of the NYLL. (*Id.* at ¶¶ 10-11 "First Counterclaim").

This case was commenced on July 13, 2018. (Dkt. No. 1). Plaintiffs served Defendants with the summons and complaint at the Defendants' place of business at JFK on July 19, 2018. (Dkt. Nos. 8-10). Defendants did not answer within the requisite twenty-one days provided by the Federal Rules of Civil Procedure, so I issued an order on August 17, 2018 directing that:

---

[2] Unless otherwise indicated, all of the facts contained herein are undisputed. I apologize to Your Honor for the length of this background. I believe, however, it is necessary as the relief that is recommended warrants a full understanding of the proceedings held to this point. These matters are all contained in the submissions to date as appearing on the docket.

[3] In addition, all Plaintiffs bring a claim for unjust enrichment under New York common law and several Plaintiffs bring claims for failure to pay overtime, discrimination and retaliation, and defamation under common law, New York State and New York City Human Rights Laws, and the FLSA. (Am. Cmpl. at ¶¶ 163-225).

> [n]o later than August 31, 2018 one of the following events must occur: (a) the parties must file a stipulation extending the Defendants time to answer, (b) the plaintiff must file a motion for the entry of a notation of default or (c) the defendant must file an answer. If, none of the preceding events occurs by the deadlines set forth above, I will deem the plaintiff to have abandoned the case and will promptly file a Report and Recommendation urging the assigned District Judge to dismiss the case for failure to prosecute.

(ECF Order dated 8/17/18). That Order prompted Plaintiffs to file a motion for entry of default on August 24, 2018. (Dkt. No. 11).[4] Defendants did not respond to either the Court's Order or to Plaintiffs' notice thereof by August 30, 2018, so default was entered against all Defendants on that date. (Dkt. No. 13). Only thereafter did Defendant APS appear on September 7, 2018, contesting that it was served properly. (Dkt. No. 14). As Plaintiffs note, APS's submission could properly be considered as a motion to set aside entry of default. (Dkt. No. 15 at ¶ 14). Noting that Defendants Hogdahl and Slattery had not yet appeared, and being skeptical of APS's contention that it had not been served properly, I issued an order on September 11, 2018 directing Plaintiffs to move for default judgment by September 28, 2018. (ECF Order dated 9/11/2018; *see also* Dkt. No. 15 at ¶¶ 15-18).

Plaintiffs moved for default judgment on September 11, 2018. (Dkt. No. 16). Defendants opposed on September 21, 2018. (Dkt. No. 19). On October 16, 2018 Judge Brodie denied Plaintiffs' motion, finding good cause to set aside entry of default. (ECF Order dated 10/16/18). Judge Brodie ordered Defendants to answer or otherwise move with respect to the complaint within twenty-one days. (*Id.*) On November 7, 2018, Defendants moved to substitute counsel and requested an extension to file an answer. (Dkt. No. 22). Judge Brodie granted Defendants motion and extended their time to answer the complaint to November 14, 2018. (ECF Order dated 11/9/18).

On November 14, 2018, rather than answer the complaint, Defendants filed a request with Judge Brodie for a "preliminary conference . . . [to] move to dismiss the causes of action in the filed complaint pursuant to Federal Rules of Civil Procedure 12(b)." (Dkt. No. 25 at 1). Plaintiffs opposed that request, arguing that there was no basis in law or fact that warranted dismissal. (Dkt. No. 27). After reviewing these submissions and seeing no reason why discovery should not

---

[4] Plaintiffs contend that they served a copy of the August 17th Order on Defendants by regular and priority mail on August 20, 2018. (Dkt. No. 12 at ¶ 10).

proceed, I scheduled an initial conference for November 28, 2018. (Dkt. No. 28). That conference was subsequently adjourned to December 4, 2018. (Dkt. No. 29; ECF Order dated 11/21/18).

At the December 4th initial conference the parties discussed the case, the discovery that would likely occur, and the Defendants' proposed motion to dismiss. (*See* Dkt. No. 73 (Transcript of 12/4/18 Initial Conference)). Being firmly convinced that it was unlikely that Judge Brodie would grant the motion to dismiss without at least giving Plaintiffs the opportunity to conduct some discovery and file an amended complaint, and noting that by Defendants' own admissions the motion would not be fully dispositive of all claims against them, I ordered discovery to proceed and set June 4, 2019 as the date by which all discovery must be completed. (Minute Entry dated 12/4/18). Defendants subsequently did not seek leave to move to dismiss the complaint or otherwise curtail discovery in the interim. Rather, Plaintiffs subsequently filed an amended complaint, to which Defendants filed an answer. (*See* Dkt. Nos. 31 and 37).[5]

On March 6, 2019, I held a regularly-scheduled status conference with the parties. ( Minute Entry dated 3/6/19). At the conference, Plaintiffs' counsel explained that Defendants had yet to respond to Plaintiffs' January 2, 2019 document requests and interrogatories, or serve any written document requests or interrogatories on Plaintiffs. (Dkt. No. 74 (Transcript of 3/6/19 Status Conference) at 2-3). In response Defendants' counsel explained that she "[had] the documents ready," was "working on merging them together and stamping them," and would produce them "this week." (*Id.* at 3, 5). Accordingly, I ordered Defendants to respond to Plaintiffs' outstanding discovery requests and serve written discovery requests on Plaintiffs by March 15, 2019. (Minute Entry dated March 6, 2019).

On April 16, 2019, Plaintiffs filed a letter motion to compel responses to their January 2nd written discovery requests. (Dkt. No. 41). In their motion Plaintiffs recounted the Defendants' dilatory and deficient discovery conduct leading up to and following the March 6th status conference. (*Id.*) According to Plaintiffs, as of the date of their motion they still had not received from Defendants their initial disclosures pursuant to Rule 26(a)(1), written responses to the January 2nd document requests and interrogatories, a complete production of documents in a

---

[5] In their answer, Defendants assert a counter claim for attorney's fees under NYLL § 195.

usable format,[6] dates for depositions of Defendants' witnesses, or Defendants' written document requests or interrogatories. (*Id.* at 5). Ultimately, Plaintiffs sought "the Court's assistance in resolving these issues, since [their] attempts to resolve them privately with Defense counsel have been unavailing." (*Id.*) On April 24, 2019, having received from Defendants no opposition to their motion to compel, or any significant remedy of the prior discovery deficiencies, Plaintiffs supplemented their motion by seeking a 45-day extension of the discovery period. (Dkt. No. 42). In their extension request, Plaintiffs explained that "the only action taken by Defendants following [Plaintiffs'] April 16th letter motion was to provide, without comment, a limited number of documents responsive to only a few of Plaintiffs' discovery requests." (*Id.* at 1).

On May 22, 2019 I held a hearing on Plaintiffs' motion to compel. (*See* Minute Order dated 5/22/19; Dkt. No. 48 (Transcript of May 22 Hearing)). At the hearing, Plaintiffs' counsel recounted the difficulties experienced in obtaining discovery from Defendants. Plaintiffs' counsel reiterated that while he had received some documents responsive to a few of Plaintiffs' requests he still had not received written responses to document requests and interrogatories, documents responsive to the vast majority of Plaintiffs' document requests, Rule 26(a)(1) disclosures or written discovery requests from Defendants. (Dkt. No. 48 at 2-5, 6-7). Defendants' counsel insisted that Defendants had complied completely with all of their discovery obligations, including those being challenged by Plaintiffs. (*Id.* at 5-6). Notably, Defendants' counsel produced a copy of the written response to Plaintiffs' document requests along with a certificate of service. (*Id.* at 6-7). The written document responses, however, was entitled "Answer" and the certificate of service indicated that it was served by mail on March 18, 2019, which was after the March 15, 2019 deadline I imposed during the March 6, 2019 status conference. (*Id.* at 7, 9-10). Regardless, upon seeing a copy of the written responses Plaintiffs' counsel responded, "[n]ever seen it. Never seen this before." (*Id.* at 6). Plaintiff's counsel also stated that he never received Defendants' written interrogatory responses, which Defendants' counsel claimed were mailed on March 18 in the same package as Defendants' written responses to Plaintiffs' document requests. (*Id.* at 13).

---

[6] According to Plaintiffs' counsel, on April 1, 2019, Defendants produced *some* responsive documents via a "Drop Box account", but those documents could not be downloaded or printed, and therefore were "of limited utility." (Dkt. No. 41 at 3). Sometime after April 13, 2019, Defendants' counsel had a USB drive which contained the documents hand delivered to Plaintiffs' counsel. (Dkt. Nos. 47 at 4; 48 at 14).

More troubling than the late-served written document responses and possibly unserved interrogatory responses, however, was the integrity of Defendants' actual document production. Although Defendants contended that they produced all responsive documents in their possession, with the exception of certain bank and tax records (*id*. at 10-11), it became clear they did not. One of the crucial sets of documents Plaintiffs seek concern when Defendants actually gave them their pay checks. (*Id.* at 11-12). Rather than provide the underlying documents that show the dates Plaintiffs' paychecks were given to them, however, Defendants claim to have prepared a "spreadsheet" containing that information and purportedly produced it on a USB drive along with their other documents. (*Id.* at 15-16). Plaintiffs' counsel insisted that there was no spreadsheet on the USB drive he received, however, so I reviewed the actual USB drive for myself on a computer in the courtroom. (*Id.* at 16-18).   I could not find such a spreadsheet. I explained further to Defendants' counsel that regardless of whether the spreadsheet was produced, Plaintiffs were entitled to receive the underlying documents from which the spreadsheet was created. (*Id.* at 18-19).

Convinced that Defendants had failed to comply fully with their discovery obligations, I granted Plaintiffs' motion to compel in part and ordered Defendants to produce by May 23, 2019 (1) all outstanding documents owed to Plaintiffs, and (2) proof of service of the discovery responses and documents purportedly previously produced and served on Plaintiff's counsel (*i.e.*, interrogatory responses, automatic disclosures, and discovery requests). I also deemed as waived all nonprivileged-based objections to Plaintiffs' document requests and interrogatories and ordered the parties to submit by May 24, 2019 a proposed stipulation and order of confidentiality and proposed revised discovery schedule. I further directed Plaintiffs' counsel to review everything that had been produced by May 23rd and promptly provide Defendants with a letter setting forth the specific deficiencies in Defendants' document production. (*See* Minute Order dated 5/22/19; Dkt. No. 48).

On May 23, 2019, Plaintiffs' counsel provided to Defendants' counsel "a detailed, 13-page discovery deficiency letter" in compliance with my May 22nd Order. (*Id*. at ¶ 24; Dkt. No. 50-1). Among other deficiencies, Plaintiffs contended that Defendants failed to produce any documents showing: (1) the dates on which pay checks were actually distributed to Plaintiffs or deposited to their bank accounts by direct deposit; (2) the employee benefits records for each plaintiff; (3) paychecks that "bounced" or were returned for insufficient funds; (4) meal and rest breaks

provided to Plaintiffs; (5) expense reimbursements provided to Plaintiffs; (6) uniforms, uniform charges and expenses, uniform reimbursement, and uniform pay; (7) deductions made from Plaintiffs' paychecks; or (8) Hogdahl's and Slattery's contacts with New York State. (Dkt. No. 50-1 at 2-4). Defendants did not respond to their deficiency letter.

On June 18, 2019, Plaintiffs filed yet another discovery motion. (Dkt. No. 47).[7] In their motion Plaintiffs again recounted the history of the case and detailed many of the various delays and deficiencies in Defendants' discovery responses. (*Id.* at 1-5). Plaintiffs argued specifically that contrary to the Court's May 22 Order, Defendants had not produced proofs of service for their written interrogatory responses and automatic disclosures, or for their written discovery requests. (*Id.* at ¶25).[8] Most critically, Plaintiffs noted that Defendants had not produced any additional documents, let alone documents responsive to Plaintiffs' specific requests (*id.* at ¶26), despite my identification of at least one category of responsive documents that should have been produced (documents concerning late payment of wages or bounced checks). Plaintiffs sought "significant sanctions . . . including the striking of Defendants' answer, the entry of judgment in favor of Plaintiffs, and the imposition of additional sanctions and attorneys fees upon Defendants and their counsel." (*Id.* at ¶31).

On June 24, 2019, Defendants responded and contended simply that "all documents have been produced to Defendants except for the emails."[9] (Dkt. No. 49 at 1). Plaintiffs replied the following day, noting that with the exception of three documents produced after Plaintiffs filed their June 18th motion,[10] Defendants still had not produced any additional documents responsive to several of their longstanding document requests, including among other things: (1) documents showing the dates paychecks were provided to Plaintiffs, or the dates and amounts of any

---

[7] Plaintiffs' letter motion is misdated as "April 18, 2019." It was actually filed on June 18, 2019.

[8] Plaintiffs argue that the timing of service of the unsworn interrogatory responses and automatic disclosures (7:13 P.M. on May 23rd), and the failure to provide the original proofs of service, indicate that Defendants' counsel actually prepared these documents after the May 22nd hearing, not before. (Dkt. No. 47 at ¶ 25).

[9] The Defendants' response also addressed the production of certain emails, which is not relevant to the instant motions. (Dkt. No. 49 at 1-2). Defendants also requested that Plaintiffs be compelled to respond to Defendants' written document requests. (*Id.* at 2). I denied Defendants' motion finding that Defendants had not served timely written discovery requests. (Dkt. No. 52). I did, however, extend discovery to permit Defendants to produce the emails. (*Id.*)

[10] Those documents being: (1) APS's contract with Norwegian Air; (2) a Port Authority minimum wage policy for certain JFK contractors; and (3) an amendment to APS's terminal lease at JFK. (Dkt. No. 50 at 1).

paychecks that bounced or were returned for insufficient funds; (2) the employee benefits records for each plaintiff; (3) documents concerning meal and rest breaks; (4) documents concerning Plaintiffs' expenses and reimbursements for expenses; (5) documents concerning Plaintiffs' uniforms, uniform charges and expenses, uniform reimbursement, and uniform pay; or (6) documents concerning Hogdahl's and Slattery's contacts with New York State. (Dkt. No. 50 at 1-3). Interestingly, Plaintiffs noted that Defendants still had not produced the infamous "spreadsheet" that contained all the information on actual pay dates and bounced checks Defendants touted at the May 22nd hearing. (*Id.* at 1-2).

On July 25, 2019, in light of the quickly approaching August 5th discovery cutoff, Plaintiffs requested that "Defendants' answer be stricken due to their refusal to provide required discovery and repeated violations of the Court's orders, or that the discovery period be extended at least 60 days so that Plaintiffs can obtain the discovery to which they are entitled." (Dkt. No. 51)

On August 1, 2019, I denied Plaintiffs' June 18th motion without prejudice to renewal at a later date. (*See* First ECF Order dated 8/1/2019). Although I was seriously concerned about Defendants' deficient discovery responses and that their explanations about those responses lacked credibility, I believed that striking their answer and entering default was a drastic remedy that was not yet warranted. (*Id.*) Rather, I ordered Plaintiffs "to submit a detailed letter enumerating all outstanding discovery requests by close of business" on August 2, 2019. (*See* Second ECF Order dated 8/1/2019).

Plaintiffs submitted their letter on August 2, 2019. (*See* Dkt. No. 54). The letter details fourteen deficient responses to Plaintiffs' relevant document requests: (1) the dates that paychecks were distributed to Plaintiffs and/or direct deposited into Plaintiffs' bank accounts; (2) paychecks that were provided to Plaintiffs that bounced or were returned due to insufficient funds; (3) the meal and rest breaks provided to Plaintiffs; (4) expenses and expense reimbursements with respect to Plaintiffs; (5) Plaintiffs' uniforms, including but not limited to policies regarding uniforms, documents concerning the purchase or rental of uniforms, reimbursement for the cost of uniforms, uniform allowances, or the laundering or dry cleaning of uniforms; (6) incentive or bonus compensation for APS managers and staff; (7) deductions made from Plaintiffs' wages; (8) the regular pay date(s) or payroll schedule for the issuance of paychecks to Plaintiffs in 2016-18, and any changes thereto; (9) other lawsuits, charges, complaints, or investigations regarding APS's wage and hour practices during the past 6 years; (10) communications between Plaintiffs and APS;

(11) Plaintiff Sotiropoulos's medical and employee benefit records, records of medical leaves and absences, and internal communications regarding his disabilities; (12) Defendants' finances and net worth, including tax returns, financial statements, P&Ls, bank statements, recent asset transfers, and bankruptcy filings; (13) the ownership and governance of APS; and (14) the individual Defendants' contacts with New York State. (*Id.* at ¶¶ 1-5, 7-15). Plaintiffs also noted that Defendants refused to confirm that they had produced all responsive documents concerning: "(i) employee handbooks, personnel manuals, work rules, codes of conduct or ethics, and other employment or personnel policies in effect at APS's JFK facility in 2016-18; (ii) contracts and agreements between APS and any airline serviced by APS at JFK in 2016-18; (iii) contracts and agreements between APS and the Port Authority in 2016-18; (iv) operational procedures or policies issued or provided to APS by any airline at JFK or the Port Authority in 2016-18; (v) the supervision of APS staff at JFK by APS, airlines, or the Port Authority, such as supervision or management policies or guidelines, and documents concerning instructions, training, directions, hierarchy, chain of command, and rules of conduct." (*Id.* at ¶ 6).

After receiving Plaintiffs' August 2nd letter, I remained convinced that Defendants had yet to fully comply with their discovery obligations. I therefore granted Plaintiffs' July 25th motion in part, and extended discovery an additional sixty days to permit Defendants to respond in full to the outstanding discovery requests enumerated in Plaintiffs' August 2nd letter. (*See* ECF Order dated 8/2/2019). I further ordered that all nonprivileged-based objections to those requests were waived, that the documents must be produced by September 4, 2019, that all discovery must be completed by October 4, 2019, and that there would be "NO EXTENSIONS." (*Id.*)[11] I further admonished Defendants that they would be precluded from relying on any documents not produced by the September 4th deadline and that the failure to produce all outstanding discovery materials may result in sanctions. (*Id.*) I directed that "[i]n the event of such failure, Plaintiffs may apply to the District Judge . . . for an Order striking the answer and entering default." (*Id.*) I also set the final pretrial conference for October 10, 2019 at 10:00 A.M.

On September 9, 2019, Plaintiffs filed with Judge Brodie a letter requesting a pre-motion conference to strike the Defendants' answer and enter default, or to strike certain of Defendants'

---

[11] I subsequently extended discovery to November 15, 2019 to permit Plaintiffs to take the depositions of two of Defendants' witnesses, at least one of which had to be adjourned due to purported necessary emergency international business travel. (*See* Dkt. Nos. 57, 58, 59, and 62; ECF Order dated 10/9/2019).

defenses and compel discovery. (Dkt. No. 55). The letter is brief, recounting many of Defendants' failures to comply with my various discovery orders. (*Id.*) Defendants did not respond to the premotion letter pursuant to Judge Brodie's individual rules of practice. Plaintiffs subsequently supplemented their motion on September 30, 2019, relying on recent deposition testimony from Defendant Hogdahl that Defendants are in possession of "(i) . . . paycheck receipt forms and bank records showing exactly when paychecks were distributed to Plaintiffs; (ii) . . . bank records showing when Defendants' paychecks to Plaintiffs bounced or were returned for insufficient funds; and (iii) . . . expense submissions and expense reimbursement records showing whether Plaintiffs were reimbursed for the parking expenses that were deducted from their paychecks." (Dkt. No. 56 at 1). Judge Brodie then referred Plaintiffs' motion to me on October 2, 2019. (*See* ECF Order Referring Motion dated 10/2/19).

On October 10, 2019 I held what was scheduled to be the final pretrial conference, but was in actuality a status conference as I had recently extended discovery to permit Plaintiffs to depose two of Defendants' witnesses. (ECF Minute Entry dated 10/10/19; Dkt. No. 64; *see also* ECF Order granting Dkt. No. 58, dated 10/9/19). At this conference I engaged in a lengthy discussion with the parties to ascertain whether Defendants had complied fully with their discovery obligations and my many orders. Plaintiffs' counsel explained that he had not received any additional documents from Defendants after September 4th, that he reviewed all previously produced documents and emails, including attachments, and that Defendants had failed to produce any documents in the categories listed in his August 2nd letter to the Court, with the exception of a few documents concerning uniforms. (Dkt. No. 64 at 22-24, 29). Defendants' counsel insisted, as she had throughout, that Defendants had produced all responsive documents before September 4th. (*Id.* at 9-11, 20, 24, 25 ("My client told me, the payroll department, Stephanie Erskine, that everything was produced that's listed [] on the August 2nd, letter."))

Left with the same suspicion that Defendants had not complied fully with their discovery obligations or my orders, but not being certain enough to recommend sanctions, I ordered Defendants to submit an affidavit from APS identifying the specific documents, by number, that had been produced in response to each request listed in Plaintiffs' August 2nd letter. (*Id.* at 30-32 (the "October 10th Order")). Defendants submitted their declarations on October 21st and 25th, including copies of the documents produced during discovery. (Dkt. Nos. 67 and 68,

respectively.)[12] Plaintiffs then submitted counter declarations on October 27th and November 11th, pointing to the deficiencies in Defendants' production. (Dkt. Nos. 69 and 71).

I have carefully reviewed the parties' declarations (Dkt. Nos. 67, 68, 69 and 71), Plaintiffs' original discovery requests (Dkt. No. 50-2) and the documents Defendants included in their submissions (Dkt. Nos. 67-1 to 23 and 68-1 to 9). I remain convinced that Defendants have failed in their obligation to produce documents currently within their custody and control that are responsive to many of Plaintiffs' document requests. Defendants have also failed to comply with three orders compelling production of such documents (3/6/19, 5/22/19 and 8/2/19) and my October 10th Order to specifically identify the documents that had been produced in response to each request. I recount below a few of the deficiencies.[13]

## Documents regarding regular pay dates, when pay was actually paid, and which of Plaintiffs' paychecks bounced[14]

Plaintiffs claim that they were often paid late and that many of their paychecks were returned for insufficient funds, *i.e.* "bounced," in violation of both the FLSA and NYLL. (Am. Cmpl. at ¶¶ 25-27, 94-107). Accordingly, Plaintiffs have long sought documents establishing APS's regular pay dates, when Plaintiffs were actually paid (*i.e.*, when they actually *received* their paychecks or when their paychecks were *deposited* directly into their bank accounts), and which of their paychecks bounced. In response to Plaintiffs' various document requests seeking such information, and the Court's orders requiring that it be produced, Defendants point to their production of (1) payroll and employment records for each Plaintiff (Dkt. No. 67 at ¶¶ 20-21, 105-08), (2) "3,348 pages of emails" "contained in the PST file . . . related to the payroll, pay dates, and distribution of checks at the JFK Airport Station" (*id.* at ¶¶ 23, 109), (3) the "Late Check Payment List"[15] (*id.* at ¶¶ 24-25), (4) Defendants' late-produced bank statements, which "corroborate the date each check or direct deposit was *extracted* from the account," (*id.* at ¶¶ 26-

---

[12] Contrary to the October 10th Order, the declarations were not from an APS representative with knowledge of the document production, but from APS's counsel.

[13] I urge Your Honor, however, to review the parties' submissions to satisfy yourself that the recommendation in this report is sound. (Dkt. Nos. 50-2; 67; 67-1 through 67-23; 68; 68-1 through 68-9; 69; and 71).

[14] These documents are referred to as "Item 1", "Item 2" and "Item 9" in Defendants' declaration. (Dkt. No. 67 at ¶¶ 16-31, 102-12).

[15] Defendants previously referred to the "Late Check Payment List" as the "spreadsheet."

27), and (5) APS Personnel Manual (*id.* at ¶ 110). After reviewing all of the written submissions and the documents Defendants produced, I find that Defendants' responses are deficient.

First, Defendants' reliance on the Plaintiffs' payroll and employment records as evidencing the dates on which Plaintiffs *received* their paychecks is misplaced. (Dkt. No. 67 at ¶¶ 20-21). Defendants apparently concede that at least some of Plaintiffs' paychecks were issued by APS's payroll company in Seattle and then sent by Federal Express to the JFK facility in New York to be distributed by hand to the Plaintiffs. (Dkt. No. 69 at ¶ 26). Thus, the dates in the payroll and employment records indicating when the paychecks were *issued* by the payroll company in Seattle do not reflect the dates on which the paychecks were actually *received* by Plaintiffs. More troubling, however, is Hogdahl's admission that APS created documents which reflect the dates on which Plaintiffs actually "sign for the check at the station – at the station level when they pick them up." (*Id.* at ¶ 22). Hogdahl testified further that these documents were kept at the JFK station or at APS headquarters. Defendants failure to disclose these documents during discovery is a clear violation of their discovery obligations and my various discovery orders.

Second, Defendants' reliance on the "3,348 pages of emails" as satisfying their discovery obligations is also misplaced. Contrary to my October 10th Order, Defendants fail to identify which of the 3,348 pages of emails are directly responsive to these particular requests. Defendants' aggregation of 12,000 emails from separate sources into a single file for production, without separately delineating which emails are responsive to which document requests also violates the Federal Rules of Civil Procedure. Fed. R. Civ. P. 34(b)(2)(E)(i) ("A party *must* produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request.") (emphasis added). Moreover, my review of the email directories does not reveal any directly responsive information that has been produced. Plaintiffs' counsel's review of the emails themselves confirms as much. (Dkt. No. 69 at ¶ 28).

Third, Defendants' reliance on the "Late Check Payment List" (a/k/a "spreadsheet") and late-produced banks statements, fares no better. Even if the Late Check Payment List is admissible, Defendants would be required to produce the underlying documents or data upon which it is based. Defendants have not done so. Stephanie Erskine, APS's Rule 30(b)(6) designee responsible for payroll, testified that when creating the Late Check Payment List she relied in part on certified check stubs from replacement checks that were sent to Plaintiffs after the original checks were returned for insufficient funds. (Dkt. No. 71 at ¶ 3). Those check stubs have not been

produced. Erskine testified further that APS received notices from its bank, Wells Fargo, whenever payroll checks were returned for insufficient funds, but those notices have not been produced.  (*Id.* at ¶ 5; *see also* Dkt. No. 69 at ¶¶ 38-39 (similar testimony from Hogdahl)).  Those notices have not been produced.  Erskine also testified that she sometimes issued replacement payroll checks out of a corporate, non-payroll account. (Dkt. No. 71 at ¶ 5). Although APS produced the bank statements for the account from which regular payroll checks were issued, it has not produced the statements for the non-payroll account.  The failure to do so is a violation of APS's discovery obligations and my prior discovery orders.

### Meal and Rest Breaks[16]

Plaintiffs claim that Defendants failed to provide them with required rest and meal breaks pursuant to the NYLL, but nevertheless improperly deducted one hour from their daily pay to account for meal and rest breaks which were never taken.  (Am. Cmpl. at ¶¶ 122-37).  Accordingly, Plaintiffs have long sought documents which reflect the meal and rest breaks they actually took. (Dkt. No. 69 at ¶ 46).  Relying on (1) copies of Plaintiffs' payroll records, wage notices and statements, paystubs and hours logs, (2) APS's "Employee Meal and Rest Break Policy Acknowledgement Forms" signed by each Plaintiff, and (3) the thousands of emails in the "PST file," Defendants contend that they have produced all relevant documents which exist.  (Dkt. No. 67 at ¶¶ 34-46). Notwithstanding the production of these documents, even if they are relevant to Plaintiffs' meal and rest break claims,[17] Plaintiffs have identified one set of documents which relate directly to those claims and which have not been produced.

Defendants' email production establishes that beginning in March of 2018, APS maintained "meal/breaks signing sheets" which document when employees actually took their meal and rest breaks.  (Dkt. No. 69 at ¶ 60).  These documents were to be kept in 3-hole binders at each of APS's airport location, including JFK.  (*Id.*) Although these documents relate to only a portion of Plaintiffs' employment with APS, they are relevant to Plaintiffs' claims overall and should have been produced. Based on such records the trier of fact could draw appropriate

---

[16] "Item 3."  (Dkt. No. 67 at 11-15).

[17] Plaintiffs' claim is that the required meal and rest breaks were not given, but that such breaks were nevertheless regularly deducted from their pay.  If that is true, it would not be reflected in their regular payroll records.

inferences for the periods during which such documents were not maintained.  These documents should have been produced.

## Deductions and Expense Reimbursement Documents[18]

Plaintiffs contend that Defendants improperly deducted from their wages daily JFK parking fees, and then failed to remit those deducted fees to JFK, thereby violating the NYLL. (Am. Cmpl. ¶¶ 31-33, 133-16).  During discovery Plaintiffs sought documents related to those deductions and their remittance to JFK. (Dkt. No. 69 at ¶¶ 62-63, 114-15). Relying on the production of payroll and compensation records for each Plaintiff, APS's "Employee Personnel Policy Acknowledgement Forms" signed by each Plaintiff, the "PST File" containing the 12,000 emails, and APS Personnel Manual, Defendants contend that they have fully complied with their discovery obligations and this Court's many orders to produce such documents. (Dkt. No. 67 at ¶¶ 49-54, 98-99).

Both Plaintiffs' counsel and the Court have reviewed the Defendants' documents and they do not reflect in the least the deductions for parking or remittances to JFK. (Dkt. No. 69 at ¶¶ 66, 73-75, Exh. 10; Dkt. No. 67 at Exhs. 1-18). Curiously, as Plaintiffs note, Defendants telegraphed their insufficient production by responding that "[a]dditional documents related to reimbursements . . . will be produced when they are located by the accounting Department following a complete audit and investigation." (*Id.* at ¶ 64). Defendants have not indicated whether such audits and investigations have been concluded or whether additional documents have been or will be produced.  Moreover, and as Plaintiffs note, it is likely that additional documents exist which indicate if and when reimbursements checks were issued, even if covering only a brief period of Plaintiffs' employment.  (*Id.* at ¶ 76).  Sometime in 2017 or 2018 Defendants required employees to sign for receipt of each reimbursement check at their stations, including JFK.  (*Id.*)  These forms have not been produced, and therefore, Defendants have not complied with their discovery obligations or this Court's orders.

## Defendants' Financial and Corporate Ownership/Governance Records[19]

Plaintiffs have long sought the production of documents concerning APS's finances, including its "net worth . . . tax returns, financial statements, P&Ls, bank statements, recent asset

---

[18] "Item 4" and "Item 8." (*Id*. at 15-17, 25-26).

[19] "Item 13" and "Item 14."  (*Id.* at 37-38).

transfers, and bankruptcy filings" (Dkt. No. 69 at ¶¶ 168-69), and corporate ownership and governance (*id.* at ¶ 180).  Such documents are relevant not only to establish that APS, Hogdahl, and Slattery are subject to the FLSA, but also as to punitive damages on Plaintiffs' discrimination and retaliation claims. Defendants do not dispute that they have not produced documents responsive to these requests.  Instead, Defendants justify their non-production on a vague statement that "it is known that APS is not an exempt employer" (Dkt. No. 67 at ¶ 138), Plaintiffs' long-ago offered stipulation to withhold such production until Plaintiffs obtain a judgment to which Defendants have not yet agreed (*id.* at ¶ 139), a vague admission that Hogdahl is individually liable under the relevant statutes (*id.* at ¶ 140), and certain interrogatory responses indicating the corporate ownership of APS, but notably not indicating Slattery's ownership share (*id.* at ¶ 142). Defendants' wholesale refusal to produce financial and corporate ownership documents cannot be sustained. Even were the Court to entertain Defendants' excuses for nonproduction, Plaintiffs would nevertheless be entitled to the documents solely with respect to their claims for punitive damages.  Defendants have not shown that the documents should not be produced, and therefore their responses to date are inadequate.

### Personal Jurisdiction Documents[20]

Throughout the litigation Hogdahl and Slattery have maintained that they are not subject to personal jurisdiction in New York. (Dkt. No. 37, Seventh Affirmative Defense). Accordingly, Plaintiffs have long sought documents concerning Hogdahl's and Slattery's contacts with the State, in particular "documents concerning visits to New York, property owned, leased, or used by them in New York, . . .  their communications with APS personnel and third parties in New York, and the like." (Dkt. No. 69 at ¶ 194). Defendants contend that they have fully responded to these requests by producing (1) a two-page amendment to a lease for APS's facility at JFK (Dkt. No. 67 at ¶ 146) and (2) emails which "contain[] all of the information about [Hogdahl's and Slattery's] visits to JFK Airport Station and the APS Airport Station at Stewart Airport" (*id.* at ¶¶ 149-50).[21] According to Defendants, they have nothing else to produce because they "cannot produce documents which do not exist." (Dkt. No. 67 at ¶ 154). After reviewing all of the written

---

[20] "Item 15." (*Id.* at 38-39).

[21] Defendants also contend for the first time that Hogdahl and Slattery do not own, lease or use property in New York (*Id.* at ¶¶ 147-48).

submissions and the Defendants' document production I find that Defendants' responses are deficient.

First, the lease amendment is not responsive to any of Plaintiffs' personal jurisdiction requests.  It is an agreement between APS and Terminal One Group Association, L.P., was not signed by either Hogdahl or Slattery, and has nothing whatsoever to do with Hogdahl's or Slattery's contacts in New York.

Second, as best I can tell the emails contain no information at all regarding Hogdahl's or Slattery's business travel to New York. I have reviewed the directories of the email files and cannot find any such responsive information therein. Plaintiffs' counsel contends that he has "reviewed all of the emails [themselves], and can attest that they do not contain such documents." (Dkt. No. 69 at ¶ 207).  Quite glaringly, in direct contravention of my October 10th Order, Defendants have not identified the specific emails that contain the information concerning Hogdahl's and Slattery's travel to New York, or anything else concerning whether they are subject to personal jurisdiction in New York.

Third, and most importantly, Defendants' response that they have no other documents concerning Hogdahl's and Slattery's business travel to New York cannot be taken seriously. As Plaintiffs note, both Hogdahl and Slattery admitted at their depositions that they frequently visit APS's New York facilities to conduct APS business. (Dkt. No. 69 at ¶ 205; Dkt. No. 71 at ¶ 6). Notably, Defendants have not yet disputed these assertions.  Moreover, Slattery testified at his deposition "that he is in possession of travel-related documents concerning those trips, such as airline tickets, email confirmations, hotel invoices, credit card statements, expense forms, and other travel receipts." (Dkt. No. 71 at ¶ 6). These documents have not been produced. It is simply beyond belief that APS has no other documents whatsoever concerning Hogdahl's or Slattery's admitted business travel to New York as such documents are relevant to APS's financial accounting and tax reporting. In light of Slattery's admission that he has documents showing his APS business travel to New York, and that it is highly likely, if not virtually certain, that APS has records of such travel too, I simply cannot accept Defendants' response that they have no such documents in their possession, custody or control.

## Airline Exemption Documents

Defendants rely on the so-called "airline exemption" defense to defeat the overtime claims of two Plaintiffs, Rios and Teodorescu. (Dkt. No. 67 at ¶¶ 77-78, *see also* 29 U.S.C. § 231(b)(3)

(exempting "any employee of a carrier by air subject to the provisions of" 45 U.S.C. § 181)).  That defense applies if (1) the nature of the employee's work is traditionally performed by employees of air carriers and (2) the employer is directly or indirectly owned or controlled by, or under common control with, an air carrier.  *E.g., Roca v. Alphatech Aviation Servs.*, 960 F. Supp. 2d 1368, 1372 (S.D. Fla. 2013).  Accordingly, in discovery Plaintiffs sought documents that would tend to show the degree of control air carriers exercised over APS and its employees, including, *inter alia*, the contracts APS had with air carriers from 2016-2018.  (Dkt. No. 69 at ¶¶ 93, 101; Dkt. No. 67 at ¶ 76).  In response to Plaintiffs' requests, Defendants produced (1) APS's "Personnel Manual"; (2) part of APS's contract with Norwegian Airlines; (3) a Port Authority wage policy applicable to APS; (4) APS's "Uniform Guidelines" and "Personnel Guidelines"; and (5) "Personnel Policy Acknowledgment Forms" signed by each Plaintiff.  (Dkt. No. 67 at ¶¶ 80-84; Dkt. No. 69 at ¶ 94).

Despite Defendants' assertion that they have produced all responsive documents on their airline exemption defense, Plaintiffs have identified a number of easily accessible, relevant documents which Defendants have not produced.  Pointing to Defendants' email production and Hogdahl's deposition testimony, Plaintiffs note that Defendants have not produced (1) complete contracts with all of the airlines for which APS performed services (Dkt. No. 69 at ¶¶ 101-02) and (2) complete copies of APS's Training Manual, Standard Operating Guidelines and online training program, "APS Academy" (*id.* at ¶¶ 103-05).  These documents should have been produced during discovery and in response to the Court's several orders to compel.

***

In sum, Plaintiffs have identified several categories of relevant documents which Defendants have refused to produce despite Plaintiffs' repeated requests and the Court's three Orders compelling their production. Defendants' reasons for not producing these documents or otherwise complying with the Court's three Orders lack merit.

<h2 align="center">DISCUSSION</h2>

A.   <u>Rule 37 of the Federal Rules of Civil Procedure</u>

Rule 37 of the Federal Rules of Civil Procedure permits a court to impose sanctions upon a party or counsel who deliberately fails to comply with a court order.  Fed. R. Civ. P. 37(b)(2)(A) ("if a party or a party's officer, director, or managing agent ... fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is

17

pending may issue further just orders."). Rule 37 lists seven possible sanctions, including "striking pleadings in whole or in part" and/or "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii) accord Kang v. Lee, No. 96 Civ. 1145 (LBS), 1997 WL 669787, at * 3 (S.D.N.Y. Oct. 27, 1997). In addition to these sanctions, Rule 37 requires that the court order the disobedient party, its attorney, or both to pay "the reasonable expenses, including attorney's fees," caused by the failure to comply, unless the court finds the failure "substantially justified" or that "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

The Second Circuit has described the three purposes behind Rule 37 sanctions:

First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent      effect on the case at hand and on other litigation, provided that the party   against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976) (per curiam)); *see also Cine Forty-Second St. Theatre Co. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979). "'[A]ll litigants ... have an obligation to comply with court orders. When they flout that obligation[,] they ... must suffer the consequences of their actions.'" *Baba v. Japan Travel Bureau Int'l, Inc.*, 111 F.3d 2, 5 (2d Cir. 1997) (quoting *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988)).

B.   Considerations in Determining an Appropriate Sanction

A district court has broad discretion to determine the appropriate sanction for a party that engages in discovery abuses and other litigation misconduct. *Gao v. Perfect Team Corp.*, No. 10 CV 1637, 2014 WL 2465589 (ENV) (CLP), at *4 (E.D.N.Y. May 30, 2014); *Curcio v. Roosevelt Union Free School Dist.*, 283 F.R.D. 102, 107 (E.D.N.Y. 2012). "[A] decision to dismiss an action for failure to comply with discovery orders will only be reversed if the decision constitutes an abuse of that discretion." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012). The same is true for a decision to impose default judgment. *See, e.g. S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 147 (2d Cir. 2010). Courts are guided in the exercise of their discretion by the prophylactic, punitive, and remedial rationales behind Rule 37. The breadth of the court's discretion to select a sanction appropriate to the circumstances of a particular case reflects the "considerable deference [afforded] to the district court's familiarity with

18

the proceedings." *Friends of Animals, Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997); *see also Bhagwanani v. Brown*, 665 Fed. App'x 41, 43 (2d Cir. 2016). Striking a pleading, entering default judgment, or dismissing a case, "is a 'drastic remedy' generally to be used only when the district judge has considered lesser alternatives." *S. New Eng. Tel. Co.*, 624 F.3d 123, 144 (2d Cir. 2010) (quoting *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir.1988); *Martinez v. City of N.Y.*, No. 16 CV 79 (AMD) (CLP), 2018 WL 604019, at *22 (E.D.N.Y. Jan. 24, 2018). Thus, the harshness of such measures "is justified if the district court finds that the failure to comply with discovery orders was due to 'willfulness, bad faith, or any fault' of the party sanctioned." *S. New Eng. Tel. Co.*, 624 F.3d at 144 (quoting *Salahuddin v. Harris*, 782 F.2d 1127, 1132 (2d Cir. 1986)).

Courts generally consider the following factors in determining whether to exercise their discretion to strike a pleading, enter default judgment or to impose another dispositive sanction: (1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; (4) whether the non-compliant party had been warned of the consequences of noncompliance; and (5) prejudice to the party moving for sanctions. *E.g., Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009);*Martinez*, 2018 WL 604019, at * 22. No single factor controls, and it is not an abuse of discretion for a district court to order a dispositive sanction even when not every factor weighs against the party to be sanctioned. *See S. New Engl. Tel. Co.*, 624 F.3d at 144, 147-49; *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1068 ("sanctions must be weighed in light of the full record in the case.").

1.   Willfulness

Noncompliance with a court's discovery order is willful when the order is clear, the party understood the order, and the failure to comply is not due to factors beyond the party's control. *See, e.g., Joint Stock Co. Channel One Russ. Worldwide v. Infomir LLC*, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 3671036, at *21 (S.D.N.Y. July 18, 2017); *Jensen v. Allied Burton Sec. Servs.*, No. 10 CV 2043 (RJD) (LB), 2011 WL 4382347, at *3 (E.D.N.Y. May 27, 2011) (quoting *Davidson v. Dean*, 204 F.R.D. 251, 255 (S.D.N.Y. 2001)). "Willful non-compliance is routinely found, for instance, where a party has 'repeatedly failed to ... produce documents ... in violation of the district court's orders.'" *Doe v. Delta Airlines, Inc.*, No. 13 Civ. 6287 (PAE), 2015 WL 798031,

at *8 (S.D.N.Y. Feb. 25, 2015), aff'd, 672 Fed.App'x 48 (2d Cir. 2016) (quoting *Robertson v. Dowbenko*, 443 Fed. App'x 659, 661 (2d Cir. 2011) (summary order)).

It is particularly important to consider a party's course of conduct throughout the litigation when evaluating willfulness. "Taken out of context, perhaps, any individual incident of discovery misconduct may appear forgivable—especially when framed by some post hoc excuse that rings of reasonableness." *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 88 F.Supp.3d at 264.

As demonstrated by the procedural history set forth in some detail above, this case has been marked by a pattern of delay and failure to comply with the Orders of this Court.  The Court has had to hold a number of conferences to resolve various discovery disputes and has issued three Orders to Defendants to produce discovery that is clearly mandated by the Federal Rules of Civil Procedure.  It also warrants mentioning that the Defendants and their counsel have repeatedly insisted that they have complied fully with the Court's Orders and their discovery obligations when it is clear that they did not. Such a disingenuous claim indicates willfulness and weighs in favor of severe sanctions. *See Chowdhury v. Hamza Express Food Corp.*, 308 F.R.D. 74, 83 (E.D.N.Y. 2015) (finding willfulness where counsel disingenuously claimed to have complied with all court orders despite a history of violations).

Further evidence of Defendants' willfulness is their "document dump" of 12,000 emails in one large file, not producing them as they were kept in the ordinary course of business or corresponding to particular document requests.  This is compounded by Defendants' violation of my October 10th Order to produce an affidavit from someone from AVP with knowledge of the document production to identify, by number, where the documents responsive to each request could be found.

Even if the Defendants' repeated failures to obey this Court's Orders were insufficient evidence of willfulness, the failure of Defendants and their counsel to comply with the most basic discovery requirements set out in the Federal Rules of Civil Procedure can itself demonstrate willfulness that weighs in favor of a dispositive sanction. Rule 26 provides that by signing a discovery response or disclosure, a party or its attorney "certifies that to the best of the person's knowledge, information, and belief formed *after a reasonable inquiry*[,] with respect to a disclosure, it is complete and correct as of the time it is made." Fed. R. Civ. P. 26(g)(1)-(1)(A) (emphasis added). The obligation to conduct a reasonable inquiry is fundamental, and although it

runs first to counsel, it applies with equal force to the party itself. *See, e.g., Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) (explaining that "counsel and client must take *some reasonable steps* to see that sources of relevant information are located").

Once served with Plaintiffs' document requests, Defendants and their counsel were required to conduct a reasonable inquiry into the documents available. Given what has transpired over the last year, it is clear that both Defendants and their counsel failed to conduct that reasonable inquiry, whether intentionally or otherwise. Had they done so, they would have identified at the very least the responsive documents Plaintiffs' counsel uncovered after deposing Hogdahl, Slattery and Erskine, and there would have been less need, or perhaps none, for the Plaintiff to file multiple motions to compel and for sanctions, or for the Court to dedicate tremendous amounts of time ruling on them. Such a complete failure to perform a straightforward and required inquiry is patently unreasonable and could only result from an intentional failure to act. *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, at 428 (W.D.N.Y. 2017).

Given the repeated violations and examples of noncompliance with this Court's Orders, the element of willfulness has clearly been established. Defendants have not claimed that they did not understand the Court's Orders or that they were unclear. Even if there were reasons outside of Defendants' control to explain the failure to comply with some of the Orders, none have been offered. Thus, the Court finds that the first prong of the test—Defendants' willful disobedience of this Court's Orders—has been satisfied on multiple occasions and weighs heavily in favor of dispositive sanctions.

2. Efficacy of Lesser Sanctions

In determining what sanction to impose, courts must consider "the efficacy of lesser sanctions." *World Wide Polymers, Inc.*, 694 F.3d at 159 (quoting *Agiwal*, 555 F.3d at 302). However, "district courts are not required to exhaust possible lesser sanctions before imposing dismissal or default if such a sanction is appropriate on the overall record." *Chowdhury*, 308 F.R.D. at 83 (quoting *S. New Eng. Tel. Co.*, 624 F.3d at 148).

Over the past year the Court has held three conferences during which Defendants' discovery deficiencies were discussed at length. During at least two of those conferences the possibility of sanctions for noncompliance was raised. At no time did Defendants or their counsel appear to take the threat seriously. Indeed, the threat of sanctions did little to change the Defendants' conduct or approach to this litigation. In the August 2nd Order requiring Defendants

to respond in full to Plaintiffs' outstanding document requests, the Court threatened that "Defendants will be precluded from relying on any documents not produced by [September 4th]. Defendants' failure to produce the outstanding discovery material[s] by this deadline may result in further sanctions. In the event of such failure, Plaintiffs may apply to the District Judge . . . for an Order striking the answer and entering default." (ECF Order dated 8/2/2019). Thereafter Defendants only produced the bank records for one of their accounts, nothing more, even after Plaintiffs identified several specific categories of responsive documents that had not been produced following the depositions of Hogdahl, Slattery and Erskine.

"Especially in light of repeated warnings to defendants[,] . . . at a certain point, if a court does not eventually follow through on its warnings, it risks undermining its ability to control current and future would-be wayward litigants. '[U]nless Rule 37 is perceived as a credible deterrent rather than a "paper tiger," the pretrial quagmire threatens to engulf the entire litigative process.'" *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 88 F. Supp. 3d at 265 (quoting *Cine Forty-Second St. Theatre Corp.*, 602 F.2d at 1064) (citation omitted).

Having reviewed the entire record of this case over the past year and more, and in light of the history elaborated above, the Court concludes that no lesser sanction would induce Defendants' compliance and that a severe sanction is necessary to serve the deterrence rationale justifying sanctions. The Court therefore finds that this factor weighs in favor of a severe sanction.

3.    Duration of the Period of Noncompliance

Periods of noncompliance as brief as a few months have been held to weigh in favor of dispositive sanctions. *See Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 88 F.Supp.3d at 265-66 (collecting cases). Here, Defendants' noncompliance has lasted at least one year. Plaintiffs served their document requests on January 2, 2019 and Defendants still have not responded to them in full, despite three separate orders that they do so beginning on March 6, 2019. (*See* Minute Entry dated 3/6/19 and ECF Orders dated 5/22/19 and 8/2/19). Notably, Defendants have not even produced the specific documents identified at the Hogdahl, Slattery, and Erskine depositions in the early-Fall of 2019. Throughout this year-long period Defendants have knowingly withheld relevant documents that Plaintiffs need to prosecute their claims, all the while falsely claiming to have produced "everything." (Dkt. No. 64 at 25).

22

This factor also weighs in favor of dispositive sanctions because, even if the Defendants eventually comply with their obligations, they nonetheless "have dragged plaintiffs and this court through 'a pattern of prolonged and vexatious obstructions of discovery.'" *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr., Inc.*, 88 F.Supp.3d at 266 (quoting *S. New Eng. Tel. Co.*, 624 F.3d at 148). Such a history of noncompliance fully supports the imposition of dispositive sanctions.

    4.   <u>Notice of Consequences</u>

Defendants and their counsel have received at least two warnings that sanctions, including striking the answer and entry of default, could be imposed if they failed to comply with their discovery obligations and the Court's Orders. (ECF Order dated 8/2/19; Dkt. No. 64 at 30-45). Despite those warnings, Defendants have not complied fully with their discovery obligations or the Court's Orders.  That Defendants received clear, unambiguous notice that severe sanctions were possible both by written Order and in open Court weighs in favor of imposing case dispositive sanctions.

    5.   <u>Prejudice to the Plaintiffs</u>

Courts must be mindful that "real prejudice to a litigant may serve as a compelling consideration in support of dispositive relief," but that "a lack of prejudice should not be given significant weight in the overall analysis." *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr., Inc.,* 88 F. Supp. 3d at 263. The absence of prejudice is given little weight while the presence of prejudice tilts the scales heavily in favor of sanctions, because both the Second Circuit and Supreme Court "have consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions . . . Although *one* purpose of Rule 37 sanctions may in some cases be to protect other parties to the litigation from prejudice resulting from a party's noncompliance with discovery obligations, Rule 37 sanctions serve other functions unrelated to the prejudice suffered by individual litigants." *S. New Eng. Tel. Co.*, 624 F.3d at 148-49 (citations omitted).

The prejudice to Plaintiffs, while not overwhelming, is nevertheless not insignificant. Plaintiffs brought this case one and one-half years ago seeking redress for a violation of rights under the FLSA and other laws; substantial rights upon which Congress has placed a high value. Plaintiffs' counsel has sent numerous discovery requests to Defendants, engaged in substantial motion practice and participated in numerous Court conferences and hearings, all with the

principal goal of obtaining the discovery necessary to prosecute Plaintiffs' claims. Apart from the obvious cost in fees, expenses, and time spent engaging discovery and motion practice without the necessary documents, the delay in readying this case for trial is also obvious. Depositions may need to be reopened if the withheld documents were to be produced; additional document demands may also be necessary. In addition, it has been suggested that Defendants' delay in producing the responsive documents is part of a "long game" to frustrate the ultimate resolution of the case; Defendants have been sued several times for the same conduct and may be on the verge of bankruptcy. There is no question that there is prejudice here, even if it is not substantial.

Accordingly, the Court finds that the prejudice to Plaintiffs weighs in favor of dispositive sanctions for Defendants' conduct in this case.

*** 

The Court finds that the Defendants' willful noncompliance with their discovery obligations and with Court Orders merits imposition of the severest form of sanctions available under Rule 37. *See, e.g., S.E.C. v. Razmilovic*, 738 F.3d 14, 26-27 (2d Cir. 2013) (affirming entry of default judgment as a sanction for disobeying a single discovery order where proposed alternative sanctions would not induce compliance or alleviate prejudice to the opposing party and where the sanction of default would serve to make discovery orders effective in the instant case and to deter those who might be tempted to engage in similar misconduct in the future); *Guggenheim Capital LLC v. Birnbaum*, 722 F.3d 444, 451 (2d Cir. 2013) (affirming entry of default judgment and finding no abuse of discretion where district court found that defendant's "intransigence spanned months, and that less serious sanctions would have been futile"); *Joint Stock Co. Channel One Rus. Worldwide*, 2017 WL 3671036, at *26 (imposing severe sanctions based on the fact that the "discovery noncompliance was sustained and consistent [and the] failure to obey the September 8 Order was part of a broader pattern of intransigence and misrepresentation"); *Chowdhury*, 308 F.R.D. 82 (E.D.N.Y. 2015) (striking answer and granting default judgment after concluding that although "dispositive relief is a severe sanction that should be granted only sparingly, a continuing saga of dilatory conduct will satisfy the threshold for entering a default judgment under Rule 37") (citations and quotations omitted); *Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 127-28 (S.D.N.Y. 2015) (finding default judgment an appropriate sanction where defendants' history of misconduct continued even after the court issued orders threatening to impose sanctions); *Silverman & Silverman LLP v. Pacifica Found.*, No. 11-CV-1894 (FB)

(RML) 2014 WL 3724801, at *4 (E.D.N.Y. July 25, 2014) (striking the answer and entering default judgment where defendant repeatedly disobeyed discovery orders and demonstrated only minimal compliance with discovery obligations); *Lumbermens Mut. Cas. Co. v. Holiday Vehicle Leasing, Inc.*, 212 F.R.D. 139, 143 (S.D.N.Y. 2002) (ordering default judgment and prohibiting non-compliant party from introducing evidence at inquest where party continually delayed production of documents and it was not clear that the party would ever be able to produce them); *Am. Cash Card Corp. v. AT & T Corp.*, 184 F.R.D. 521, 524-25 (S.D.N.Y. 1999) (concluding that "the extreme measure of default judgment is required" where a party failed to obey five discovery orders, both written and oral, including a  lesser sanction of order compelling production that did not alter the party's conduct).

The Court respectfully recommends that Your Honor strike Defendants' answer and enter default judgment in Plaintiffs' favor on liability, and send the case promptly to an inquest on damages.

C.    Payment of Plaintiff's Expenses is Mandatory

In addition to other sanctions, Rule 37 requires that the court order the disobedient party, its attorney, or both to pay "the reasonable expenses, including attorney's fees," caused by the failure to comply with a discovery order, unless the court finds the failure "substantially justified" or that "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The language of the Rule is mandatory absent a showing by the noncompliant party of substantial justification or circumstances that would render awarding expenses unjust. *See id.*; *Mugavero v. Arms Acres, Inc.*, 680 F.Supp.2d 544, 574 (S.D.N.Y. 2010) (collecting cases).

Defendants have made no showing that their failures were substantially justified, nor have they raised any extenuating circumstances that would make an award of expenses unjust. It is therefore further recommended that Plaintiffs' counsel submit a detailed list of fees and expenses which he contends were incurred unnecessarily as a result of Defendants' conduct, including but not limited to the costs and fees expended in having to file and attend conferences and hearings held to adjudicate the numerous motions to compel and for sanctions. The parties are directed to confer in order to reach an agreement regarding the amount of the award of fees and expenses and to seek Court intervention if they should be unable to resolve the total amount within fourteen days of the District Court's decision with respect to the Court's Report and Recommendation.

## **CONCLUSION**

For the reasons set forth above, I respectfully recommend that the Court grant Plaintiffs' motion to strike the answer and enter default.  I further recommend that Defendants and their counsel be ordered to pay the reasonable expenses, including attorney's fees, associated with Plaintiffs' multiple motions to compel and to strike.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Rachel P. Kovner within fourteen days of receipt hereof. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15, 16 (2d Cir. 1989).


*Ramon E. Reyes, Jr.*
RAMON E. REYES, JR.
United States Magistrate Judge


Dated: February 21, 2020
       Brooklyn, NY